IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PHILIP WAYNE HENDERSON,      )   No. C 98-4837 CW (PR)
                             )
            Petitioner,      )   ORDER DENYING PETITION FOR A
                             )   WRIT OF HABEAS CORPUS
    v.                       )
                             )
ROSANNE CAMPBELL, Warden,    )
                             )
            Respondent.      )
_____)

INTRODUCTION

Petitioner Philip Wayne Henderson, a prisoner of the State of California who is incarcerated at Mule Creek State Prison, filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After granting in part and denying in part Respondent's motion to dismiss the petition, the Court ordered Respondent to show cause why the petition should not be granted. Respondent has filed an answer to the petition and a memorandum of points and authorities and exhibits in support thereof. Petitioner has filed a traverse to the answer.

For the reasons outlined below, the Court DENIES the petition for a writ of habeas corpus on all claims.

PROCEDURAL HISTORY

On May 7, 1986, Petitioner was convicted of two counts of first-degree murder, one count of second-degree murder with

special circumstances, one count of voluntary manslaughter, two counts of robbery, and one count of auto theft. He was sentenced to life without possibility of parole.

Petitioner's direct appeal was denied by the California Court of Appeal on November 30, 1990. His petition for review to the California Supreme Court was denied on February 25, 1991.

Six years later, Petitioner commenced his first action before this Court. See Henderson v. California, Case No. C 97-1505 CW (PR). His case was opened on April 24, 1997, the date he submitted to the Court a document entitled "Notice of Intent to Timely File Petition for Writ of Habeas Corpus and Request for Extension of Time to File Completed Petition Or, in the Alternate, Relaxation of Possible Time Constraints," which was signed on April 21, 1997. In an Order dated July 2, 1997, the Court dismissed the April, 1997 filing because it was not a recognizable petition for writ of habeas corpus. The Court gave Petitioner until July 30, 1997 to file a proper petition. It notified Petitioner of the time limits under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and the possibility of equitable tolling, noting, "If grounds to toll the limitations period are found, the limitations period will be tolled nunc pro tunc." Henderson, Case No. C 97-1505 CW (PR), July 2, 1997 Order at 2. The Court postponed determination of equitable tolling until "such time as a recognizable petition for a writ of habeas corpus is before the Court." Id. at 3.

United States District Court
For the Northern District of California

2

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

On July 28, 1997, Petitioner filed an amended petition for a writ of habeas corpus in which he sought to present four claims: (1) illegal search and seizure of telephone billing records, leading to subsequent derivative searches and arrest; (2) ineffective assistance of counsel, based on violations of attorney-client privilege; (3) prosecutorial misconduct, including subornation of perjury and "inflammatory tactics"; and (4) erroneous evidentiary rulings.

On October 6, 1997, the Court dismissed the amended petition without prejudice for failure to exhaust state remedies, finding that even under the "most liberal construction," Petitioner's claims of ineffective assistance of counsel and prosecutorial misconduct were unexhausted. The Court did not inform Petitioner that he could withdraw the unexhausted claims as an alternative to dismissal.

On December 8, 1997, Petitioner filed a petition for a writ of habeas corpus with the California Supreme Court, which was denied on June 24, 1998.

On December 1, 1998, Petitioner filed a new federal habeas corpus petition challenging the same 1986 convictions.  See Henderson v. Newland, Case No. C 98-4837 CW (PR).  According to its index, that petition set forth at least ten claims for relief, including:  (1) actual innocence; (2) prosecutorial misconduct, including unnecessary death qualification of the jury, presentation of false, irrelevant and inflammatory evidence,

3

witness tampering, subornation of perjury and erroneous evidentiary rulings; (3) improper closing argument; (4) juror misconduct and jury tampering; (5) evidence tampering; (6) cumulative error; (7) insufficiency of evidence; (8) illegal search and seizure; (9) violations of attorney-client privilege; and (10) illegal arrest.

In an Order dated March 15, 1999, the Court liberally construed Plaintiff's April, 1997 filing as a timely first federal petition with a filing date of April 21, 1997. Assuming tolling of the statute of limitations during the pendency of the first federal petition, the Court found that Petitioner would have had only two days from the October 6, 1997 Order of Dismissal for Failure to Exhaust in which to file a state habeas action that would have continued to toll the running of the statute of limitations. Moreover, even if the limitations period had not run at that point, the Court found that Petitioner would have had only two days from the denial of his state action in which to file a renewed federal petition. However, he waited over four months to do so. For these reasons, the Court dismissed the 1998 petition as untimely under 28 U.S.C. § 2244(d). The Court found Petitioner had presented no grounds warranting additional equitable tolling. The Court denied Petitioner's motions for a certificate of appealability and for reconsideration. The Ninth Circuit also denied a certificate of appealability.

Petitioner then filed a third petition challenging the same

4

1986 convictions.  See Henderson v. California, Case No. C 01-3691 CW (PR).  His 2001 petition was originally filed in the Eastern District of California and subsequently transferred to the Northern District.  Petitioner alleged that the Court's Order dismissing his 1998 petition as untimely was erroneous, and that he was entitled to federal review of his claims.

In an Order dated December 31, 2003, the Court construed the 2001 petition as a Rule 60(b) motion for reconsideration of the March 8, 1999 Order of Dismissal in Case Number C 98-4837 CW (PR), in light of subsequent Ninth Circuit decisions requiring that district courts:  (1) give pro se habeas petitioners the opportunity to amend their petitions to delete unexhausted claims before dismissal; (2) alert petitioners to the possible impact on the one-year limitations period; and (3) inform petitioners if the limitations period had already expired.  See, e.g., James v. Pliler, 269 F.3d 1124, 1125-26 (9th Cir. 2001); Ford v. Hubbard, 330 F.3d 1086, 1101 (9th Cir. 2003), judgment vacated sub nom. Pliler v. Ford, 542 U.S. 225 (2004); Brambles v. Duncan, 330 F.3d 1197, 1202 (9th Cir.), amended, 342 F.3d 898 (9th Cir. 2003), cert. den. and judgment vacated, 542 U.S. 933 (2004), withdrawn, 404 F.3d 1118 (9th Cir. 2005).  Concluding that it had failed to warn Petitioner in accordance with Ford and Brambles when his 1997 petition was dismissed as unexhausted, resulting in his subsequent 1998 petition being dismissed as untimely, the Court reopened Case Number C 98-4837 CW (PR).

United States District Court
For the Northern District of California

On March 9, 2004, the Court granted Respondent's request for a stay of proceedings in light of the grant of certiorari by the United States Supreme Court in Pliler v. Ford.  The Supreme Court then held that federal courts had no obligation to give the warnings that the Ninth Circuit had required regarding the consequences of dismissal.  Pliler, 542 U.S. at 231.  Respondent then moved to dismiss Petitioner's petition on the grounds that the habeas petition filed in 1998 was untimely and the Court erred in reinstating it; in the alternative, even if the 1998 petition could be reinstated, those claims which did not relate back to the 1997 petition should be dismissed.

In an Order dated March 6, 2006, the Court reviewed Petitioner's 1997 and 1998 petitions and granted Respondent's motion to dismiss in part and denied it in part.  The Court determined which claims raised in his 1998 petition were similar in time and type to allegations in his 1997 petition.  Therefore, the following claims were found to be timely under AEDPA: (1) prosecutorial misconduct based on presentation of false, irrelevant and inflammatory evidence; (2) prosecutorial misconduct based on allegations of witness tampering and subornation of perjury; and (3) prosecutorial misconduct based on violations of attorney-client privilege.  Petitioner was also allowed to proceed with claims of actual innocence and cumulative error to the extent they were based on the allegations related to his prosecutorial misconduct claims.

Respondent filed an answer to the petition addressing the aforementioned claims, and Petitioner filed a traverse.  The Court now addresses the merits of Petitioner's claims.

STATEMENT OF FACTS

In its written opinion, the California Court of Appeal summarized the factual background as follows:

> The victims, Ray Boggs, Angie Boggs, and Raymond Boggs, Jr., lived in an apartment at 753 Webster Street in San Francisco.  At the time of her death, Angie was carrying a 30-week-old fetus.

> Ray Boggs was last seen alive on January 11, 1982.  On that day he went to his job at a glass company in Redwood City and worked all day.  Shortly before 5 p.m. he made a telephone call, received a salary advance and left for the day.  The Boggses' landlord, Ilyas Absar, received a telephone call from Angie Boggs on January 11, 1982.  Angie had requested some help from Absar in connection with problems she had with another tenant.  Absar had last seen Ray on January 8, 1982, when he collected a portion of the rent due.

> In response to Angie's call, Absar went to the Boggses' apartment on January 13, 1982.  No one answered the door.  When he returned a few days later, he still could not locate the Boggs family.  On January 25, Absar contacted Ray's employer who thought Ray had probably left town.  Absar wanted to regain possession of the apartment.  Upon the advice of an attorney, he posted a notice on the Boggses' apartment door, mailed copies of the notice to them and to their emergency contacts.  He received no response to his notices.

> On February 17, 1982, 18 days after posting the notice, Absar entered the apartment.  He observed that the living room had the usual furniture and that the closet in that room contained clothes.  However, the bedroom had no furniture and no clothes.  Only a mattress lay on the floor.  There were chairs and a table in the kitchen, but one of the chairs had been broken.  Absar saw no signs of a struggle or fight.  He found no money in the apartment.

7

Prior to this occasion, he had last been in the apartment in July 1981.  At that time he had noticed a rifle hanging on the living room wall.  The rifle was gone when he entered the apartment in February 1982.

Next to the telephone, Absar found what appeared to be a good-bye note to the Boggses.  It stated something to the effect that they were sorry to have to leave like this but that is the way it was.  Absar threw the note away.

On February 28, in cleaning up junk in the backyard of the apartment building, Absar came across the body of Ray Boggs wrapped in a rug or cloth.  The back of the Webster Street apartment building was on stilts.  There, underneath the Boggses' apartment, in an area which is exposed to the elements, he saw a large bundle.  At first Absar thought it contained old clothes.  He and a friend attempted to move it but it smelled so bad and it weighed so much that Absar realized it could not be clothes.  Absar opened the bundle up a little and saw a person's upper arm.  He called the police.

Dr. Boyd Stephens, Chief Medical Examiner for the City and County of San Francisco, conducted the autopsy.  The body was in an advanced state of decomposition at the time of the autopsy.  Ray Boggs's body had been wrapped in a blanket, sheet and pillows.  He had been hog-tied, i.e., the hands were tied to the feet in the front.  The obvious injury was a gunshot wound to the forehead, with the bullet lodged in the brain.  The bullet recovered from Ray's body was a .22-caliber round.  There were ligature marks on the areas of the body which had been tied.  The bullet had not penetrated any of the bedding wrapped around the body.  It was Dr. Stephens's opinion that Ray had been shot in one location and transported later.  The degree of decomposition observed was consistent with January 11 being the time of death.

Inspectors Napolean Hendrix and Earl Sanders were in charge of the Boggs homicide investigation.  A few days after the discovery of the body, the inspectors learned that the decedent was Ray Boggs.  The inspectors interviewed the neighbors in the apartment building, Absar, and Ray Boggs's employer, but failed to find any leads as to possible suspects in the homicide.  However, the inspectors did learn from the neighbors or other witnesses that the Boggs family had been missing for six or seven weeks.

On March 19, 1982, the inspectors received a call that more bodies had been found at the 753 Webster Street location. In cleaning the backyard area, one of the residents of the apartment building came upon the bodies of Angie Boggs and Raymond Boggs, Jr., behind a headboard, in the filth and debris under the house. The police had not entered that particular part of the premises on February 28.

Angie's body had been wrapped in a blanket which one of the neighbors recognized as belonging to the Boggs family. She was wearing a nightie, panties and only one slipper. The autopsy revealed that Angie's body was in an advanced state of decomposition. A towel had been wrapped tightly around her neck and knotted on one side. Dr. Stephens determined Angie's death had been caused by asphyxiation, even though any ligature marks from strangulation had been destroyed by the decomposition process. He also was of the opinion that she had been killed in one location and transported to another.

Ray Boggs, Jr., was approximately one year old when he died. He too had been wrapped in a blanket and was in an advanced state of decomposition at the time of the autopsy. Although Dr. Stephens classified the death as a homicide, he could detect no apparent trauma and was unable to determine the cause of death. He testified as to the relative ease with which an individual could asphyxiate a small child.

The fetus carried by Angie at the time of her death was at approximately 30 weeks gestation and viable outside the womb. In addition to analysis of physical developments of the fetus, Dr. Stephens determined the age of the fetus by comparison of X-rays taken during the autopsy with sonograms taken during the course of prenatal care received by Angie. The last sonogram conducted upon Angie was on December 30, 1981, at which time the fetus was between 27 and 28 weeks of gestational age. In this case, information about the fetus's age aided Dr. Stephens in establishing the time of death for Angie. Dr. Stephens stated it was most likely that mother and child were killed approximately two weeks after December 30, 1981.

There was no visible sign of trauma to the fetus or to the uterus of the mother. Dr. Stephens concluded the fetus died because the mother died. He explained that shortly after the death of a mother, the oxygen supply to the fetus becomes inadequate and the fetus dies.

In conducting the investigation, the inspectors learned that among the items missing from the Boggses' apartment were Ray's rifle, a ring given to Angie by Ray for Christmas 1981, and Ray's green panel truck.  Inspector Hendrix discovered the serial number of the rifle with the assistance of the Department of Alcohol, Tobacco and Firearms.  The .22-caliber rifle had been purchased by Ray from a sporting goods store in Redwood City.  Additionally, on March 20, 1982, the owner of a San Francisco jewelry store contacted the police in connection with the ring.  After reading about the homicides in the newspaper, the store owner believed he might have sold the victim, Ray Boggs, a diamond ring just before Christmas 1981.  The address on the receipt for the ring showed the 753 Webster Street address.  The proprietor loaned Inspector Hendrix a duplicate of the ring.  A friend of Ray's testified that Ray's father had given him the green truck and that Ray never agreed to let friends borrow it.

The inspectors requested from the telephone company the telephone records for the Boggs apartment, beginning with December 1981.  After receiving the records, Inspector Hendrix noticed that the party billed for the Boggses' telephone was Philip Henderson.  He did not recognize the name and thought it was another alias of Ray Boggs.  The inspector knew that Ray Boggs had gone by the name Ray Martinez in the past.

Inspector Hendrix began calling all the long-distance and toll numbers listed on the record in order to speak with anyone who might know the Boggs family.  On April 6, 1982, Inspector Hendrix called a number in Riverview, Florida, and spoke with Philip Henderson.[1]  After informing Henderson that he was calling in connection with a homicide investigation, he asked whether he knew Ray Boggs.  Henderson answered that he did know a Ray Boggs in Northern California, who had a wife or a girlfriend.  He was not sure if Ray had a baby or whether he owned a green truck.  Henderson stated that he stayed with the Boggses in January 1982 and that he left at the end of the first or second week of January and hitchhiked back to Florida.  He also stated that, on Ray Boggs's request, he had deposited the money needed with the telephone company in order to obtain a

---

[1] The telephone conversation with Philip Henderson was admitted into evidence in his trial only.

telephone for the apartment.

Henderson told the inspector that another couple, named John and Pam, had also stayed with the Boggses. He stated that this couple had left some belongings behind which he placed in an area downstairs, the basement or the alley. Inspector Hendrix informed Henderson of Ray's murder and the location and manner in which the bodies were found. He then said, "I'm sure you're familiar with underneath the back stairs there." Henderson replied, "Yeah, the alleyway, God." He stated Ray had been a good friend.

Henderson also told Inspector Hendrix that he knew of one person, Jimmy, a big, fat Black man, to whom Ray owed money. Ray and Jimmy had an argument over the debt shortly before Henderson left San Francisco.

Finally, Henderson agreed to call back with more specific information about the date he left San Francisco or any other helpful information.

The following day Inspector Sanders called again and spoke to Philip's mother. He asked that Philip call him back. Philip returned the call and in that conversation, he recalled that he and his wife Velma left San Francisco on January 11, 1982, in the evening. Angie had left the apartment in the mid-afternoon with the baby and had not returned. Ray returned home from work, but left soon thereafter to look for Angie. Ray came home without Angie before the Hendersons left the apartment but then departed again.

In attempting to retrace the Hendersons' trip to Florida, the inspectors contacted the Reno, Nevada, police. Their investigation disclosed that on January 12, at 1:30 p.m., Philip Henderson had pawned Angie's missing diamond ring in Reno. In Carlin, Nevada, the inspectors located Ray's missing truck, which a man identifying himself as "Wayne Henderson" had sold to the owner of a garage in town. Also in Carlin, they spoke with a motel owner who identified the Hendersons as a couple to whom she had rented a room in January 1982 in exchange for a parrot. She stated that the couple related they were from San Francisco, had lost their home in a mud slide and were on their way to Florida. The truck they were driving needed some repair work and the motel owner told Philip Henderson about a garage in town.

**United States District Court**
For the Northern District of California

The inspectors learned that in Salt Lake City, Utah, the Hendersons met a couple, Mark Koci and his girlfriend, with whom they spent three or four days. The couple gave the Hendersons a ride further east. Koci noticed that the Hendersons had in their possession a bolt action .22-caliber rifle. Some of the bullets for the rifle had cross cuts on top. Philip Henderson told Koci that they were on the run.

Inspectors Hendrix and Sanders arrested the Hendersons on April 29, 1982, near Tampa, Florida, and transported them separately to the United States Marshal's office for processing. In an interview immediately thereafter, Philip invoked his right to counsel and declined to answer any questions.

After being advised of her <u>Miranda</u> rights (<u>Miranda</u> v. <u>Arizona</u> (1966) 384 U.S. 436), Velma agreed to answer the inspectors' questions.[2] She stated that she and her husband moved in with the Boggs family before Christmas in December 1981 and left on a Monday in January 1982. While living there, upon Ray's request, Philip Henderson agreed to put up the cash needed to get a telephone for the apartment.

As Philip had stated in the telephone conversation, Velma said that Angie had left the apartment in the afternoon with the baby and did not return. Ray came home from work around 5 p.m., left a short while later, returned and then left again.

According to Velma, the Hendersons packed only a portion of their belongings, leaving the rest behind in the Boggs apartment. Philip wrote the Boggses a note. The two then took a bus to Berkeley where Philip had arranged for some people to pick them up. Velma did not recall the names of the man and woman but she stated they drove them straight through to Salt Lake City. Velma said she had just had a tooth pulled and was distracted because of the pain.

The Hendersons worked in a thrift store in Salt Lake City until they met another couple who took them to Wyoming. Velma could not recall their names. From Wyoming, they received a ride to Florida from a Keith Tolzac. Velma did not recall stopping in any other

---

[2] Velma's statement was admitted into evidence at her trial.

12

cities, including Reno or Carlin, Nevada. She knew that
Philip had a rifle with him as they traveled across the
country but she did not know where he got it or where it
was at the time of the interrogation.

Finally, Velma stated that Angie always wore the diamond
ring Ray had given her. She also recalled that Ray had
a green parrot which he had received as a gift from Angie.

While in Florida, the inspectors learned that Philip had
sold the rifle to Tim Beladeau, an acquaintance in
Riverview, Florida. Prior to 1982, Henderson and
Beladeau had talked about altering bullets by marking
around or across so as to shorten the projectile and
increase its expanded capacity.

A criminalist testified that the bullet retrieved from
Ray Boggs's brain was fired from a .22-caliber long
rifle. The bullet had mushroomed and was deformed. The
surface had been impacted and pushed back over the rest
of the bullet. The expert could not positively identify
the rifle taken from Beladeau as the one which had fired
the bullet. However, the identifying characteristics of
a bullet fired from the rifle were consistent with the
characteristics found on the bullet which killed Ray
Boggs. Additionally, the copper wash on the bullet
recovered from Boggs was similar to the copper wash on
the clips which were abandoned by the Hendersons in the
backseat of Koci's car.

Philip Henderson's Defense

Philip testified in his own defense at his trial. He
denied killing the Boggs family or being present when
they were killed.

According to Philip, Velma and he had recently arrived
in San Francisco when they met Angie at a Jack-In-The-
Box restaurant on Market Street. They became friendly
with the Boggs family. The Hendersons were residing at
a hotel in the Tenderloin district and receiving general
assistance from the county at the time. The Boggses
asked them to move into the Webster Street apartment in
order to share living expenses. The Hendersons moved
into the Boggses' apartment on November 28, 1981.

Philip stated that the Boggses sold marijuana and
cocaine out of their apartment and that "7th Street
types," and "biker types" were often the customers. He
also testified that a man called "Hawaiian Jimmy,"

13

accompanied by a large Black man, had a loud argument
with Ray over a debt owed by Ray.  Jimmy beat Ray over
the head once or twice with his cane.  Philip had heard
that Jimmy was associated with a motorcycle group called
the "Sons of Hawaii."

The Hendersons became frightened by the Boggses' drug
business and by the violence.  Before Christmas, they
decided to leave and return to Florida where Philip's
mother resided.  However, Ray asked them to stay a
little while longer until he could find another couple
to move into the apartment.

According to Philip, on January 11, 1982, he stayed home
with Velma who was suffering with a toothache.  Angie
left the apartment at approximately 4:30 p.m.  Ray
returned from work at about 5:30 p.m. and then left to
look for Angie.  He returned an hour later and asked the
Hendersons to help him in searching for her.  They
agreed and walked first to the Tenderloin district,
where Angie, a former prostitute, had some contacts.
They also searched the Jack-In-The-Box restaurant and
some nearby bars, without any luck.

When they returned to the Boggses' apartment, they found
things in disarray.  No one was home.  The lights were
off, but the television was on.  Ray's rifle was off the
rack and leaning against the wall.  His work shoes were
next to the couch.  Philip walked around the block and
found Ray's green truck parked a block away.  The
Hendersons became frightened by the circumstances and
decided this would be a good time to leave.

The Hendersons had little money so they decided to steal
the Boggses' property.  They took Ray's truck, his
rifle, the gun pouch and clips, the parrot, and a
jewelry box.  The good-bye note they left behind,
explaining that they were "skipping out" and upset about
the "situation," was meant to refer to their leaving and
the items they stole.

Philip admitted selling Angie's ring and providing a
false address when he sold her ring in Reno.  He also
admitted telling false stories about being a victim of a
mud slide in order to gain sympathy.  In selling Ray's
truck to the owner of a garage in Carlin, Philip lied
that his brother had title and that he would mail it
when he reached his brother's home back east.  They also
traded the parrot in Carlin for three night's lodging

14

and $75.  He kept the rifle.  He denied altering the
bullets but admitted having knowledge of how to do it.

From Carlin the Hendersons took a cab to Elko and then
caught a train to Ogden and then Salt Lake City.  He
recalled meeting Koci and his girlfriend and receiving a
ride to Wyoming.  However, Philip denied telling Koci
that he and Velma were in trouble.

As to his statements to Inspector Hendrix, Philip
testified he lied because he did not want to be
prosecuted for stealing Ray's truck or to be associated
with the type of people involved in this case.  After
receiving the inspector's call, Philip informed Velma
that as a result of the theft they might be suspects in
the homicide investigation.  He had no difficulty in
lying to Inspector Hendrix.  He did not think the police
would follow him across the country for an auto theft.

Edward Ramos, also known as Hawaiian Jimmy, testified
for the prosecution on rebuttal.  He admitted
threatening Ray with physical injury and explained it
concerned the failure to repay a debt.  The two men had
agreed to a trade; Ramos would work on Ray's truck in
exchange for Ray fixing some windows.  Ramos had
performed his part of the bargain but Ray had not.
Ramos attempted to collect the cash value of his work.
He did receive a $50 check from Ray on January 7, 1982.
A few weeks later he went to the glass company to
collect the rest of the money owed.  He did walk with a
cane but denied ever hitting anyone with it.

Velma Henderson's Defense

Velma did not testify in her own defense at her trial
and presented no witnesses.

People v. Henderson, A036290, 3-15 (Nov. 30, 1990) (Resp't

Ex. 4) (footnotes renumbered).

STANDARD OF REVIEW

A federal writ of habeas corpus may not be granted with

respect to any claim that was adjudicated on the merits in state

15

United States District Court
For the Northern District of California

court unless the state court's adjudication of the claims:

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the relevant state court decision.  Id. at 412.

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson,

16

532 U.S. 782, 795 (2001) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993)).

DISCUSSION

I.   PROSECUTORIAL MISCONDUCT

   A.   BACKGROUND

   Petitioner claims that the prosecutor committed misconduct by: (1) introducing false, irrelevant, and inflammatory evidence throughout his trial; (2) committing witness tampering and subornation of perjury; and (3) violating his attorney-client privilege.

   His first claim regarding the introduction of false evidence was raised on direct appeal and denied by the California Court of Appeal in a reasoned decision.  The remaining claims were raised in his state habeas petition and were summarily denied.

   B.   APPLICABLE FEDERAL LAW

   Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  <u>See</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986).  The right to due process is violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  <u>See</u> <u>id.</u>; <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  A prosecutorial

misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks and citation omitted), cert. denied, 516 U.S. 1017 (1995).

When a prosecutor obtains a conviction by the use of testimony which he or she knows or should know is perjured it has been held consistently that such conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury. United States v. Agurs, 427 U.S. 97, 103 (1976). The same result obtains when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears. Napue v. Illinois, 360 U.S. 264, 269 (1959). If the prosecutor knows that a witness has lied, the prosecutor has a constitutional duty to correct the false impression of the facts. United States v. LaPage, 231 F.3d 488, 492 (9th Cir. 2000). Prosecutors will not be held accountable for discrepancies in testimony where there is no evidence from which to infer prosecutorial misconduct. See United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995), cert. denied, 516 U.S. 945 (1995). A factual basis for attributing knowledge to the government that the testimony was perjured must be established. See Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004).

18

United States District Court
For the Northern District of California

In sum, in order to prevail on a claim based on <u>Agurs</u> and <u>Napue</u>, a petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.  <u>United States v. Zuno-Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003) (citing <u>Napue</u>, 360 U.S. at 269-71).

Generally, the appropriate standard, on federal habeas corpus review of a state conviction, for determining whether a prosecutor's misconduct requires relief is whether the error had a substantial and injurious effect or influence in determining the jury's verdict, rather than whether it was harmless beyond a reasonable doubt.  <u>See</u> <u>Johnson</u>, 63 F.3d at 930.  However, this standard is inapplicable to habeas claims of a violation of a prosecutor's duty not to present, or to correct, false evidence. <u>Hayes v. Brown</u>, 399 F.3d 972, 984 (9th Cir. 2005).  When the prosecution allows false evidence to be presented during trial, the standard on habeas review is whether there is "any reasonable likelihood" that the false evidence could have affected the jury's judgment, that is, the standard set forth in <u>Agurs</u>. <u>Hayes</u>, 399 F.3d at 984.

C.   ANALYSIS

1.   Claim Denied in Reasoned State Court Decision: Prosecutorial Misconduct Based on the Presentation of Allegedly False, Irrelevant and Inflammatory Evidence

In determining whether the state court's decision is

19

contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision.  <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  It also looks to any lower court decision examined or adopted by the highest state court to address the merits.  <u>See</u> <u>Williams v. Rhoades</u>, 354 F.3d 1101, 1106 (9th Cir. 2004) (because state appellate court examined and adopted some of the trial court's reasoning, the trial court's ruling is also relevant).

Petitioner's first prosecutorial misconduct claim relates to the prosecutor's introduction of the following allegedly false, irrelevant, and inflammatory evidence:  (a) that Petitioner yelled and cursed at a five-year-old African-American neighbor; (b) that he had knowledge and possession of cross-cut bullets; and (c) that he was involved in a white supremacist organization. He alleges that the only value of such evidence was to help portray him as a "violent psychopath who belongs to white supremacists groups, engages in violent exchanges with black children, and cross-cuts bullets to increase the amount of damage they can do."  (Pet. at 45.)

a.   Testimony Regarding the Ashley Child

Petitioner alleges that the prosecutor committed misconduct

United States District Court
For the Northern District of California

by presenting the false[3] and inflammatory evidence that he yelled

and "cussed out" the five-year-old child of the Boggses'

neighbors, an African-American couple named Carol and Ronald

Ashley. (Pet. at 31-34.)

The appellate court summarized the factual background of

this claim as follows:

> The following circumstances surround the admission of
> evidence of Philip's behavior in connection with the
> Ashley child, the son of the Boggses' neighbor. Ronald
> Ashley was asked by the prosecutor on redirect
> examination whether he recalled an incident in which
> Philip "cussed out your child and was angry at your
> child, . . ." Defense counsel objected on grounds of
> relevancy, and Evidence Code sections 352 and 1101.[4]

---

[3] In another section below, the Court addresses Petitioner's claim
that the Ashleys committed perjury when they testified about this
incident. <u>See</u> <u>infra</u> Discussion Part I.C.2.a.(1).

[4] California Evidence Code § 352 provides as follows: "The court
in its discretion may exclude evidence if its probative value is
substantially outweighed by the probability that its admission will
(a) necessitate undue consumption of time or (b) create substantial
danger of undue prejudice, of confusing the issues, or of misleading
the jury." Cal. Evid. Code § 352.

California Evidence Code § 1101, provides as follows:

(a) Except as provided in this section and in Sections 1102,
1103, 1108, and 1109, evidence of a person's character or a
trait of his or her character (whether in the form of an
opinion, evidence of reputation, or evidence of specific
instances of his or her conduct) is inadmissible when
offered to prove his or her conduct on a specified occasion.

(b) Nothing in this section prohibits the admission of
evidence that a person committed a crime, civil wrong, or
other act when relevant to prove some fact (such as motive,
opportunity, intent, preparation, plan, knowledge, identity,
absence of mistake or accident, or whether a defendant in a
prosecution for an unlawful sexual act or attempted unlawful
sexual act did not reasonably and in good faith believe that
the victim consented) other than his or her disposition to
commit such an act.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The court sustained the objection on the basis that it was beyond the scope of redirect.  Then, during the cross-examination of Philip, the prosecutor asked him whether the incident occurred.  Defense counsel's Evidence Code section 352 objection was overruled and he answered that he did not recall the incident.  The defense stated its continuing objection to this testimony for the record.  Thereafter, on cross-examination, the prosecutor asked Carol Ashley if she recalled when Philip yelled at her five-year-old son.  The defense again objected on the basis of relevancy, and Evidence Code section 352 and 1101, by the objection was overruled.  The witness answered that she did recall Philip Henderson yelling at her son and that the situation got to the point where her husband had to tell him to stop screaming at the child.

Later, outside the jury's presence, the defense indicated its intent to recall Ronald Ashley and asked for a rule prohibiting any further examination about this yelling incident.  The prosecutor again argued that it went to motive, and in any event some of this evidence had been admitted without an objection.  The court ruled that enough had been said on the subject and "since it [has] been asked and answered I don't expect to hear anything more about it this morning."

Resp't Ex. 4 at 32 (footnote added).

Petitioner alleges that the testimony regarding the Ashley child caused him to be seen by the jury as a "violent, racist sociopath who is in the habit of screaming uncontrollably at children."[5]  (Pet. at 31.)  He claims that

(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness.

Cal. Evid. Code § 1101.

[5] The prosecutor only referred to the incident once during his closing argument when he said, "Here's a man who earlier screams at a five year old, then doesn't remember it.  That's something you would remember."  RT 6416.

he was not given prior notice of the prosecutor's intent to present this evidence during his case-in-chief.  He also argues that he did not present any character evidence to justify this irrelevant and highly prejudicial attack on his character.

On direct appeal, Petitioner's argument was rejected by the appellate court as follows:

> Although character evidence is inadmissible to prove a defendant's conduct on a specified occasion, a defendant's conduct is admissible when relevant to prove some fact other than his or her disposition to commit such an act, such as motive, intent or opportunity.  (Evid. Code, § 1101.)  The assertion of an admissible purpose, such as motive, is not enough to admit the evidence of an uncharged act.  Such evidence may only be admitted where the conduct in question serves logically, naturally and by reasonable inference to establish the material fact.  (People v. Thompson (1980) 27 Cal.3d 303, 315-316.)  "The court 'must look behind the label describing the kind of similarity or relation between the [other conduct] and the charged offense; it must examine the precise elements of similarity between [these two] with respect to the issue for which the evidence is proffered and satisfy itself that the link of the chain of inference between the former and the latter is reasonably strong.' [Citation.]"  (Id., at p. 316, fn. omitted.)  "The inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged [conduct] with a material fact."  (Id., at p. 317.)
>
> The relevance of Philip's conduct toward the Ashley child to prove motive in this case was too attenuated.  While admission of this evidence was error under Evidence Code Section 1101, it was harmless.  (See People v. Williams, (1988) 44 Cal.3d 883, 904-910, cert. den. sub nom. Williams v. California (1988) 488 U.S. 900.)  The testimony was brief and the judge barred any further evidence on the subject.  The other properly admitted evidence of Philip's guilt was so

overwhelming, there is no reasonable probability that the admission of this evidence would have altered the result in this case.

Resp't Ex. 4 at 32-33 (brackets in original).

The Court need not decide whether the admission of the testimony regarding the Ashley child was error under California law.  See Pulley v. Harris, 465 U.S. 37, 41 (1984) (A state court's evidentiary rulings are not subject to federal habeas review unless they violate federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.).  Even if it was, to obtain habeas relief Petitioner must show that the admission of such evidence "rendered the trial so fundamentally unfair as to violate due process." See Dillard v. Roe, 244 F.3d 758, 766 (9th Cir. 2001) (citing Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998)).  Here, it did not.  The other evidence against Petitioner was abundant:  he and Velma lived with the Boggses prior to the murder; they wanted to return to Florida but had no means; in Petitioner's own testimony, he admitted that they had no money so they decided to steal the Boggses' property, including Mr. Boggs's truck, his rifle, the gun pouch and clips, the parrot, and Ms. Boggs's jewelry; it was not speculation for the jury to conclude that robbery was in fact the motive for the murders of the Boggses; Petitioner and Velma's time of departure was placed directly after the murder; they fled

24

United States District Court
For the Northern District of California

across the country by selling property they stole from the
Boggses; and it was reasonable for the jury to conclude that
Petitioner stole Mr. Boggs's .22-caliber rifle and used it to
shoot him because (1) the rifle typically hung on the apartment
wall, (2) Mr. Boggs's body had been found hog-tied with one bullet
wound to his head, and (3) the ballistics evidence was consistent
with the conclusion that the bullet retrieved from Mr. Boggs's
body came from that rifle.

The appellate court's determination was not contrary to, or
an unreasonable application of, clearly established Supreme Court
precedent.  See 28 U.S.C. § 2254(d)(1).  Accordingly, Petitioner's
prosecutorial misconduct claim fails, and his claim for habeas
relief on this basis is denied.

> b. Testimony Regarding Petitioner's Knowledge and
> Possession of Cross-cut Bullets

Petitioner alleges that Mark Koci and Tim Beladeau's
testimony regarding his knowledge and alleged possession of cross-
cut bullets was false and irrelevant; therefore, the prosecutor
committed misconduct by allowing such evidence to be admitted.[6]

The appellate court summarized the factual basis for
Petitioner's claim as follows:

---

[6] Petitioner's possession and knowledge of how to cross-cut
bullets was brought out by the prosecution to support its theory that
the bullet retrieved from Mr. Boggs's body had been altered by cross-
cutting.  A criminalist testified that the bullet had mushroomed and
that altered bullets display a mushroom effect upon impact.

United States District Court

For the Northern District of California

> Philip next charges the erroneous admission of evidence
> that he possessed altered bullets and had knowledge of
> how to alter bullets to increase their capacity to
> expand.  He had challenged the admission of this
> evidence in an <u>in limine</u> motion denied by the trial
> court.  The evidence came in during the testimony of
> Mark Koci who stated he had found some of these cross-
> cut bullets in his car, left behind by appellants.  It
> was also admitted during the testimony of Tim Beladeau
> who stated that Philip and he had discussed how to
> alter bullets in this fashion.  On Philip's cross-
> examination, he admitted his knowledge of altering
> bullets and having such conversations with Beladeau.

Resp't Ex. 4 at 34.

Petitioner alleges that Mr. Koci falsely testified that Petitioner was in possession of cross-cut bullets.  He also argues that the testimony was irrelevant because the prosecution was unable to prove that the bullet retrieved from Mr. Boggs's body had been cross-cut.

The appellate court found the evidence admissible as follows:

> Evidence is relevant and therefore admissible only if
> it tends logically and naturally to prove or disprove a
> material disputed issue in the case.  (Evid. Code,
> § 210.)  Philip's argument is based on the
> criminalist's testimony.  Although the criminalist
> could not state whether the bullet retrieved from Ray
> had been altered by cross-cutting, he did state that it
> had mushroomed and that altered bullets have a mushroom
> effect upon impact.  Because the bullet in this case
> had been so damaged by the impact, the criminalist was
> unable to state whether or not it had been cross-cut.
>
> Evidence of Philip's knowledge and possession of cross-
> cut bullets was clearly relevant to the question of the
> perpetrator's identity, a disputed issue in this case.
> Philip had experience with cross-cut bullets and had
> possessed such bullets on his cross-country flight to

26

Florida.  The evidence showed these altered bullets
mushroom upon impact and that the bullet which killed
Ray Boggs had in fact mushroomed.  The poor condition
of the bullet prevented the criminalist from analyzing
whether it had been altered.  The jury could infer that
the mushrooming had been caused by alteration of the
bullets.

Further, we find no merit in Philip's contention that
the prejudice was greater than the probative value of
this evidence.  The 'prejudice' referred to in Evidence
Code section 352 is not synonymous with 'damaging.'  It
means evidence which uniquely tends to evoke an
emotional bias against defendant which has very little
effect upon the issue.  (<u>People</u> v. <u>Yu</u> (1983) 143
Cal.App.3d 358, 377 cert. den. <u>sub nom. Yu</u> v.
<u>California</u> (1984) 464 U.S. 1072.)  The evidence here
had significant probative value, tending to show
Philip's commission of the offenses charged.  Exclusion
under Evidence Code section 352 was not warranted.

Resp't Ex. 4 at 34-35.

Here, both the trial court and the appellate court found that

the testimony regarding Petitioner's knowledge and alleged

possession of cross-cut bullets was relevant and admissible

evidence.  The appellate court concluded that the challenged

evidence was relevant to the issue of the identity of the

perpetrator who murdered the Boggses, and that the admission of

the evidence did not render the trial so fundamentally unfair as

to deny Petitioner due process of law.  See <u>Estelle v. McGuire</u>,

502 U.S. 62, 70-75 (1991) (due process rights not violated by

admission of relevant evidence).  Although the criminalist could

not state for certain that the bullet retrieved from Mr. Boggs's

body had been cross-cut, he did testify that the bullet had

mushroomed and that altered bullets mushroom after impact.  The

evidence was not prejudicial because Petitioner had fair warning the evidence was going to be presented and an adequate opportunity to cross-examine the witnesses who presented the evidence.

Petitioner has not shown that the state court's admission of the evidence of his knowledge and possession of cross-cut bullets violated any federal constitutional right or denied him a fundamentally fair trial. Furthermore, he has not shown that Mr. Koci's or Mr. Beladeau's testimony was false. The appellate court's rejection of his claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. <u>See</u> 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner's request for habeas relief on this claim is denied.

c.   Inspector Hendrix's Testimony Regarding
Petitioner's Involvement in a White
Supremacist Organization

Petitioner alleges that the prosecutor engaged in misconduct by allowing Inspector Hendrix, an investigator for the prosecution, to falsely testify about Petitioner's alleged involvement in a white supremacist organization. (Pet. at 38, 43.) He contends that this evidence was false, inflammatory and irrelevant. (<u>Id.</u>) He adds that it was only presented to portray him as a racist. (<u>Id.</u>)

According to the appellate court, the factual background for the basis of this claim is as follows:

The third evidentiary objection raised by Philip

28

**United States District Court**
For the Northern District of California

concerned testimony to the effect that he had received
mail in his capacity as acting chairman of the "Free
World Party," a White supremacist group.  The evidence
first came in under the following circumstances.
First, during Inspector Hendrix's examination when he
was called as a witness by the defense, he was asked
about items found in the trunk which the Hendersons had
sold in Carlin.  He related the various things
retrieved, including some letters addressed to a "Wayne
Hendrix" or "Phillip Henderson."  Defense counsel
showed the inspector a photograph, marked as a defense
exhibit, and asked him to identify it.  The inspector
testified it was a photographic enlargement of one of
the letters found in the truck and that it was
addressed to "Reverend Wayne Hendrix, Free World Party
Chairman, 2014 West Hills Avenue, Tampa, Florida."
Another address in Riverview, Florida, was also written
on the envelope.

Then when examined by the prosecutor, Inspector Hendrix
was asked if he knew whom "Reverend Wayne Hendrix"
referred and the inspector replied that it referred to
Philip Henderson.[7]  He was then asked to what "Free
World Party" referred.  The inspector stated that it
was a White supremacy group.  The defense moved to
strike the statement and thereafter, outside the jury's
presence, moved for a mistrial.  The court denied the
motion, noting that the address on this envelope,
including the name of the organization, was first
elicited on the defense's own examination.  The court
stated that any favorable inference which the jury
might draw from the evidence that Philip was a reverend
could be countered by evidence of the nature of the
organization involved.  (See Evid. Code, § 356.)  After
a voir dire of the inspector on the basis of his
knowledge that this was white supremacist group, the
court ruled that there would be no further questioning
on this subject.  Further, he stated an admonition to
disregard the reference to a White supremacist group
would leave the jury with the impression that Philip
was a reverend and therefore of high moral character.

Resp't Ex. 4 at 35-37 (footnote renumbered).

---

[7] Other evidence in the record indicates that Philip Henderson
often went by the name Wayne and also used the name Wayne Hendrix.

29

The appellate court found that the evidence should not have been admitted by the trial court without foundation or a showing of an exception to the hearsay rule:

> In its brief, Philip's counsel suggests the court should have denied admission of any evidence that he was an ordained minister, and refused admission of the defense exhibit, thereby precluding the prosecutor from examining on the meaning of the Free World Party. We agree that without any foundation or showing of any exception to the hearsay rule, the reference to Philip as a reverend should not have been admitted for the truth of the matter.

Id. at 37. However, the appellate court concluded that Petitioner was estopped from claiming any error on direct appeal, and that, in any event, he was not prejudiced by the admission of this evidence:

> [A]s the evidence was introduced during Philip's own examination of Inspector Hendrix, he is estopped from charging error in its admission on appeal as it was "invited" by him. (People v. Moran (1970) 1 Cal.3d 755, 762, citing Witkin, Cal. Evidence (2d ed. 1966) § 1286, p. 1189.) In addition, the one sentence reference to "White supremacy group" in a trial in which race was not even a remote issue did not cause prejudicial error.

Id.

In his federal petition, Petitioner alleges that the prosecutor committed misconduct by introducing the evidence because there was no independent evidence presented to corroborate Inspector Hendrix's testimony. He claims that Inspector Hendrix should not be believed because he committed perjury during another portion of his testimony. Inspector

30

Hendrix testified that the person he spoke to at the radio station stated Petitioner was a regular caller.  RT 6025. Petitioner attaches two letters from a radio station in Tampa, Florida (WMNF 88.5).  The first letter, dated June 16, 1991, was written by Gregory E. Musselman, who stated that neither of the two employees who worked at the station in 1982 recalled making any allegations against Petitioner to any authorities.  Pet'r Ex. C6.  The second letter, dated September 3, 1996, is from the same radio station.  Id.  The letter states that from 1979 to 1986 the station did not have a public call-in show because the necessary equipment for such a show was not installed until 1987.  Id. Petitioner claims these letters prove that Inspector Hendrix committed perjury.

Even assuming that Inspector Hendrix committed perjury, the Court finds that Petitioner fails to meet his burden to show that habeas relief is warranted on this claim because there is no reasonable likelihood that Inspector Hendrix's brief reference to a "White supremacy group" could have affected the judgment of the jury.  See Agurs, 427 U.S. at 103 (conviction which prosecutor obtained by knowing use of perjured testimony must be set aside if there is any reasonable likelihood that testimony could have affected the judgment of the jury).  The appellate court found no prejudice in the admission of Inspector Hendrix's testimony because it was not likely that the evidence affected the jury's verdict in that the race of Petitioner and the Boggses was not at

31

issue.

The appellate court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d)(1). Therefore, this claim for habeas corpus relief is denied.

2.   Claims Denied Summarily by State Court

Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002).  When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law.  See Himes, 336 F.3d at 853; accord Lambert v. Blodgett, 393 F.3d 943, 970 n.16 (9th Cir. 2004).  The court need not otherwise defer to the state court decision:  "A state court's decision on the merits concerning a question of law is, and should be, afforded respect. If there is no such decision on the merits, however, there is nothing to which to defer."  Greene, 288 F.3d at 1089. Nonetheless, "while we are not required to defer to a state court's decision when that court gives us nothing to defer to, we

32

United States District Court
For the Northern District of California

must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001).

               a.    Prosecutorial Misconduct Based on Witness Tampering and Subornation of Perjury

Petitioner's second claim of prosecutorial misconduct is that the prosecutor "suborned perjury from witnesses whose initial statements did not fit the prosecution's theory of the case," including the testimony of:  (1) Ronald and Carol Ashley; (2) Ana Caquias, a defense witness; (3) Ilyas Absar, the Boggses' landlord; and (4) Edward "Hawaiian Jimmy" Ramos.  (Pet. at 56.)

               1)   Ronald and Carol Ashley's Testimony

Petitioner alleges that the inspectors persuaded the Ashleys to fabricate their testimony about Petitioner screaming at their five-year-old child and to change their testimony about the date they last saw the Boggses.  (Id. at 52.)  According to Petitioner, the Ashleys did not mention the incident involving their child during the preliminary hearing, and the fact that the Ashleys' testimony changed in a manner favorable to the prosecution was enough to make a "prima facie presupposition of witness tampering."  (Id. at 52, 56-57.)

The record shows that the preliminary hearing testimony of the Ashleys did not contain any mention of the incident between

33

Petitioner and their child.  Furthermore, they were more certain about the last date they saw the Boggses when they testified during the trial.  However, such allegations are insufficient to show that the prosecutor committed misconduct by suborning perjury.  First, the Ashleys were not specifically asked about any incident involving Petitioner and their child during the preliminary hearing.  During the hearing, their testimony focused on the last time they saw the Boggses alive.  Although their trial testimony differed somewhat from their testimony at the preliminary hearing, Petitioner has not shown that their testimony was actually false or that the prosecutor knew or should have known that it was false.  See Zuno-Arce, 339 F.3d at 889.  Accordingly, this claim for habeas relief fails because the Court finds that the state court's denial of his claim on this issue was objectively reasonable.  Himes, 336 F.3d at 853.

2)   Ana Caquias's Testimony

Petitioner alleges that the prosecutor committed misconduct by tampering with defense witness Ana Caquias.  (Pet. at 57-64.) Ms. Caquias lived with the Boggses in the summer of 1981, and she moved out in October, 1981.  (RT 5741-5742.)  Petitioner claims that Ms. Caquias's testimony significantly changed between the time she gave her initial statement to the police and when she testified during trial.

During her audio-taped interview with police right after Mr.

34

Boggs's body was discovered, Ms. Caquias made several statements about threats made to Mr. Boggs.  She stated that she overheard an argument between Mr. Boggs and a man named Sonny Barger, a member of the Hell's Angels.  Pet'r Ex. B2 at 1-3.  She also stated that Ms. Boggs felt that it would be better for her to leave because she felt like "there was some danger" and that the Boggses left town for a while because Mr. Boggs's life had been threatened.  Id. at 4, 6.  During the interview, Ms. Caquias told police that Mr. Boggs was threatened in her presence on at least three occasions.  Id.

Ms. Caquias also testified about the altercation between Mr. Boggs and Sonny Barger at preliminary hearings prior to trial. RT 5744-5745.  However, she claimed that after the second preliminary hearing a man named William Freeman "beat [her] up" because of her testimony during the hearing.  RT 5755-5756.

During Petitioner's trial, Ms. Caquias was called as a defense witness.  She testified that she lied about seeing Mr. Barger threaten Mr. Boggs and that she fabricated everything she said during the audio-taped interview with the police.  RT 5743, 5746-5748, 5753, 5759-5764, 5778-5782, 5798.  She also testified that she was taking methamphetamine during the police interview. RT 5802.  Even though Ms. Caquias was a defense witness, the prosecutor agreed to give her immunity if she testified.  RT 5739.

35

United States District Court
For the Northern District of California

The Court finds that Petitioner has not shown that the prosecutor committed misconduct by tampering with Ms. Caquias's testimony at his trial.  Ms. Caquias was a defense witness and the prosecutor gave her immunity from any charges relating to her testimony, including her methamphetamine use.  RT 5802. Petitioner's defense attorney was allowed to thoroughly impeach her using the tape she made when interviewed by police.  The jury was then able to judge her credibility for themselves based on the evidence presented at trial.

Because Petitioner fails to show that the record supports his assertion of prosecutorial misconduct with respect to Ms. Caquias and her testimony, the Court finds that the state court's denial of his claim on this issue was objectively reasonable. See Himes, 336 F.3d at 853.  Therefore, Petitioner's claim for habeas relief is denied to the extent it is based on this claim.

### 3)   Dr. Ilyas Absar's Testimony

Petitioner alleges prosecutorial misconduct because the prosecutor induced Dr. Absar, who owned the apartment rented by the Boggses, to give false testimony at trial regarding the date of his last contact with the Boggses.  The date upon which Dr. Absar last had contact with the Boggses was an important issue at Petitioner's trial.[8]  Petitioner alleges that the police convinced

---

[8] Petitioner claims that Respondent does not controvert the fact that he was "unavailable to commit the murders" after 1:32 p.m. on January 12, 1982.  (Traverse at 34.)  The record shows that police investigation revealed that Petitioner had pawned Ms. Boggs's ring in

United States District Court
For the Northern District of California

Dr. Absar to change his testimony and that the prosecutor presented such testimony despite knowing it was false.  He states, "The likelihood that the prosecution had nothing to do with the change, given the totality of the circumstances in this case, is remote."  (Pet. at 51.)

Dr. Absar first told police that he had last spoken with Ms. Boggs on January 13, 1982, when she requested that he come and speak with the Ashleys about leaving their son's tricycle in the hallway.[9]  (Pet. at 48.)

Dr. Absar's testimony changed when he testified during the trial.  On direct, he testified that when he had given the date of January 13, 1982 as the last time he had spoken to Ms. Boggs, he was basing that on the dates noted in his rent receipt book.  RT 4161.  He stated that when he got the call from Ms. Boggs he was unable to go to the Webster Street apartment building until two days after her call.  RT 4161.  He had rent receipts from other tenants in the building showing that he was at the Webster Street apartment building on January 15 and 22.  RT 4161.  Therefore, he deduced that January 13 or 20 were the two possible days he could

---

Reno at 1:32 p.m. on January 12, 1982.  RT 5119.

[9]  During a police interview on April 8, 1982, one of the inspectors asked Dr. Absar, "Angie had called you, but it was on a Wednesday?"  Pet'r Ex. B3 at 3.  After Dr. Absar confirmed that as correct, the inspector asked, "Could it have been Wednesday the 6th?"  Id.  Dr. Absar responded, "No, it was either the 13th or the 20th, more likely the 13th."  Id.  According to Petitioner, Dr. Absar also told a defense investigator in November, 1982 that he was ninety percent sure that the last time he spoke with Ms. Boggs was between January 13th and the 20th.  (Pet. at 48.)

United States District Court
For the Northern District of California

have spoken with Ms. Boggs.  RT 4161.  Dr. Absar testified that he was informed by defense counsel that the precise date was "very important," RT 4163, and he was extensively questioned about the date during the preliminary hearing, RT 4166.  Therefore, he attempted to find ways to verify the date of Ms. Boggs's call.  RT 4163-4166.  He contacted the two people he had dinner with the night of the phone call.  RT 4167.  After contacting them, he changed his testimony to reflect that the date he got Ms. Boggs's call was on January 11, 1982.  RT 4167.  The prosecutor subsequently called Susan Moss, one of the individuals with whom Dr. Absar had dinner, as a witness at trial.  RT 4765.  She testified that she recalled the date of the dinner was January 11, 1982 because she had marked it in her datebook.  RT 4766.

Petitioner's claim falls short because he has not established that the testimony given by Dr. Absar was perjured.  Although Dr. Absar changed his testimony, Petitioner has offered no evidence that Dr. Absar purposely fabricated his testimony.  Dr. Absar gave a reasonable explanation of how he determined the correct date he received Ms. Boggs's call.  There was no indication from the record, or any evidence produced by Petitioner, that Dr. Absar gave false trial testimony.  Therefore, the Court finds no support for Petitioner's prosecutorial misconduct claim relating to the prosecutor's tampering with Dr. Absar's testimony because "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony."  Coe v. Bell, 161 F.3d

United States District Court
For the Northern District of California

320, 343 (6th Cir. 1998); see also Zuno-Arce, 44 F.3d at 1423 (no
evidence of prosecutorial misconduct where discrepancies in
testimony could as easily flow from errors in recollection as from
lies).  The Court finds that the state court's denial of
Petitioner's claim on this issue was objectively reasonable.  See
Himes, 336 F.3d at 853.  Accordingly, his claim for habeas relief
based on this claim is denied.

> 4)  Edward "Hawaiian Jimmy" Ramos's Testimony

Petitioner claims: (a) that Hawaiian Jimmy committed perjury
during his testimony; (b) that the prosecutor should not have been
allowed to make a "dramatic" demonstration during the trial with
Hawaiian Jimmy's cane; and (c) that the prosecutor erroneously
vouched for the credibility of Hawaiian Jimmy.

> a)  Perjured Testimony

During his trial testimony, Hawaiian Jimmy admitted that he
threatened Mr. Boggs for failing to repay a debt.  The prosecutor
called Hawaiian Jimmy during his rebuttal case.  The following
exchange took place during his direct examination:

    Q: Did you ever threaten to use physical force on him?
    A: Yes.
    Q: Were you serious about it at the time?
    A: Yes.

RT 6173.  However, the part of his testimony that Petitioner
claims is perjured relates to whether Hawaiian Jimmy actually hit

39

Mr. Boggs over the head with his cane.  Petitioner had testified that Hawaiian Jimmy not only threatened Mr. Boggs but he actually hit him over the head with a cane.  He stated that Hawaiian Jimmy came over to Mr. Boggs's house and "during the course of [an] argument, almost toward the end of the argument he beat Ray over the head once or twice with his cane."  RT 5223.  During direct examination, Hawaiian Jimmy stated that although he threatened to use physical force on Mr. Boggs, he never hit him over the head with his cane.  RT 6174.

Petitioner claims that Hawaiian Jimmy committed perjury when he denied beating Mr. Boggs; however, Petitioner can only support this claim with his own testimony that he had witnessed the beating.  The jury was able to consider the testimony of Petitioner and compare it to that of Hawaiian Jimmy in order to make a credibility determination as to whom to believe.  Therefore, Petitioner fails to show that the record supports his assertion of prosecutorial misconduct with respect to this issue.

b)   Cane Demonstration

Hawaiian Jimmy testified that he had the cane he brought with him to trial since approximately April, 1981.  RT 6174.  He stated that he weighed about two-hundred and sixty pounds; therefore, he used a cane that was made from one-inch galvanized pipe.  RT 6174-75.  During Hawaiian Jimmy's testimony, the prosecutor "slammed the cane down on one of the court's tables."  RT 6175.  The judge stated that "it made a heck of a noise."  RT 6175.  The cane was

40

United States District Court
For the Northern District of California

not entered into evidence but it was passed to the jury.  RT 6174.
In his closing argument, the prosecutor stated, "That cane clearly
demonstrates Hawaiian Jimmy never banged anyone on the head."  RT
6289.  Petitioner alleges that there was no foundation offered for
the demonstration or to prove that the cane Hawaiian Jimmy had in
court was the only cane that he possessed.  (Pet. at 54.)

Petitioner fails to offer proof that the demonstration with
the cane was an error that denied him a fundamentally fair trial
as guaranteed by due process.  Even if the demonstration was a
violation of state evidentiary rules, defense counsel failed to
object and a violation of state evidentiary rules does not
automatically render a trial fundamentally unfair.  See Jammal v.
Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

Here, Petitioner did not allege, and the Court does not find,
any constitutional right that was violated by the cane
demonstration.  Furthermore, defense counsel had the opportunity
to cross-examine Hawaiian Jimmy about his cane.  Therefore, the
Court finds that the cane demonstration, in itself, did not
preclude Petitioner from having a fair trial.

c)   Prosecutorial Vouching

Petitioner alleges that during the prosecutor's closing
argument he erroneously vouched for the credibility of Hawaiian
Jimmy.

A prosecutor may not vouch for the credibility of a witness.

United States v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999);

United States v. Lopez, 803 F.2d 969, 973 (9th Cir. 1986)

(improper to suggest that witness found credible by the grand jury

should therefore be credible to the trial jury), cert. denied, 481

U.S. 1030 (1987).  Prosecutorial misconduct occurs when a

prosecutor vouches for the credibility of a witness by giving

personal assurances of the witness's truthfulness or suggesting

that there is information not presented to the jury which supports

the witness's testimony.  See Berger v. United States, 295 U.S.

78, 86-88 (1935); see also Lawn v. United States, 355 U.S. 339,

359-60 n.15 (1958).  Such vouching is misconduct because it poses

two dangers:  it may lead the jury to convict on the basis of

evidence not presented, and it carries with it the imprimatur of

the government.  See United States v. Young, 470 U.S. 1, 18

(1985).  To warrant habeas relief, prosecutorial vouching must so

infect the trial with unfairness as to make the resulting

conviction a denial of due process.  Davis v. Woodford, 384 F.3d

628, 644 (9th Cir. 2004) (citation omitted).

     During the prosecutor's closing argument he stated,

     Hawaiian Jimmy is the kind of guy that you might not take
     home for dinner.  He is the type of guy that you met in the
     bar and he bought you a drink you would be, probably would
     have a hell of a good time with him.  He is honest, he is
     forthright.

RT 6289.

     The statements made by the prosecutor in this case are

42

similar to the comments of the prosecutor in <u>Johnson v. Sublett</u>,

63 F.3d at 930.  In <u>Johnson</u>, the prosecutor stated, "He . . . is a

credible witness.  He was telling you the truth."  <u>Id.</u>  The

prosecutor in <u>Johnson</u> conceded that the vouching constituted an

error.  <u>Id.</u>  The only question before the Ninth Circuit was

whether or not the vouching constituted reversible error.   The

Ninth Circuit stated:

> If [the witness's] credibility were the linchpin of the
> state's case, the prosecutor's unfortunate endorsement
> of [the witness] would have constituted reversible
> error in the Arizona courts.  However, in the present
> case, there was a great mass of evidence against the
> defendant . . . .  Considering the strength of the
> state's case, the prosecutor's overreaching could not
> have had the substantial impact on the verdict
> necessary to establish reversible constitutional error.

<u>Id.</u> (citation omitted).

Even if the prosecutor erroneously vouched for the

credibility of Hawaiian Jimmy during his closing argument, the

Court must find that such an error so infected Petitioner's trial

that the resulting conviction was a denial of due process in order

to warrant habeas relief.  <u>Woodford</u>, 384 F.3d at 644.  As in

<u>Johnson</u>, the credibility of Hawaiian Jimmy was not the "linchpin"

of the prosecution's case, even though Petitioner claims that

Hawaiian Jimmy could be responsible for the murder of the Boggses.

The Court finds that Petitioner fails to demonstrate that the

prosecutor's endorsement of Hawaiian Jimmy's credibility resulted

in a denial of a fair trial.

United States District Court
For the Northern District of California

Accordingly, the state court's denial of Petitioner's prosecutorial misconduct claim on the above issues relating to Hawaiian Jimmy's testimony was not objectively unreasonable.  <u>See</u> <u>Himes</u>, 336 F.3d at 853.  Thus, his claim for habeas relief based on these claims is denied.

### b.    Prosecutorial Misconduct Based on the Violation of Attorney-Client Privilege

Petitioner alleges that his right to a fair trial was violated because the prosecution breached his attorney-client privilege.  He alleges that the prosecution:  (1) had access to the computer database of the Public Defender's Office and obtained confidential information relating to his defense at trial; (2) used this access improperly to obtain his psychiatric records and Children's Service Agency records; (3) seized letters that he sent to Velma while in jail; and (4) monitored his conversations with defense counsel at the jail.

Standing alone, the attorney-client privilege is merely a rule of evidence; it has not been held a constitutional right. <u>Clutchette v. Rushen</u>, 770 F.2d 1469, 1471 (9th Cir. 1985), <u>cert.</u> <u>denied</u>, 475 U.S. 1088 (1986).  In some situations, however, government interference with the confidential relationship between a defendant and his counsel may implicate Sixth Amendment rights. <u>See</u> <u>id.</u>

A petitioner must show, at a minimum, that the intrusion was purposeful, that there was communication of defense strategy to

44

the prosecution, or that the intrusion resulted in tainted evidence.  <u>United States v. Danielson</u>, 325 F.3d 1054, 1067 (9th Cir. 2003) (citing <u>Weatherford v. Bursey</u>, 429 U.S. 545, 558 (1977)).  Such an intrusion violates the Sixth Amendment only when it substantially prejudices the defendant.  <u>Danielson</u>, 325 F.3d at 1069; <u>see also</u> <u>United States v. Green</u>, 962 F.2d 938, 941 (9th Cir. 1992); <u>United States v. Hernandez</u>, 937 F.2d 1490, 1493 (9th Cir. 1991).  Substantial prejudice results from the introduction of evidence, gained through the intrusion, against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial. <u>Danielson</u>, 325 F.3d at 1069-70.

> 1)   Access to Confidential Information
>        Relating to His Defense at Trial

Petitioner alleges the prosecutor committed misconduct and violated his Sixth Amendment rights by gaining access to Petitioner's confidential files.  These files were stored on the computer database of the Public Defender's Office, which was part of the Wang computer system shared by several criminal justice agencies.  This alleged violation of the attorney-client relationship was raised in a motion to dismiss filed on February 25, 1985.  Resp't Ex. 10 at 1674-1689.  Specifically, the motion asserts that:

. . . Lt. Thomas Sutmeyer of the [San Francisco] Police

Department's Planning and Research Division secretly
gained access to the libraries containing all the
documents produced by the Public Defender's word
processing equipment.  Lt. Sutmeyer did not inform the
Public Defender of the Hall of Justice Wang Committee
of this access.  The Public Defender did not have an
opportunity to remove sensitive documents from the
system or to use another method of transcription.

Id. at 1676 (brackets added).  At an in camera hearing in support

of the motion, defense counsel identified a number of documents

pertaining to Petitioner's case that may or may not have been in

the computer database of the Public Defender's Office at the time

Lt. Suttmeier[10] conducted his investigation.  Pet'r Ex. E1 at 1-77.

However, while the motion raised concerns that communications

regarding Petitioner's trial tactics and defenses might have been

compromised, it failed to show actual proof that Lt. Suttmeier

accessed or allowed the prosecution access to any of Petitioner's

files:

At this point the defense does not yet know if Lt.
Sutmeyer in fact penetrated, or allowed anyone else to
penetrate, the Public Defender's libraries and whether
he or someone else read the files.  However, we do know
that he either requested or at least did not object to
obtaining access to these files.

Resp't Ex. 10 at 1679.

At the hearing on the motion to dismiss, Lt. Suttmeier

testified that he and two others that he supervised, Management

Assistant Richard Curtis and Officer Thomas Strong, had access to

---

[10] Lt. Suttmeier's last name was incorrectly spelled as "Sutmeyer"
in the motion to dismiss.  Resp't Ex. 11 at 3.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

all of the libraries of the individual criminal justice agencies in San Francisco, including the Public Defender's Office.  Resp't Ex. 11 at 5-6.  He claimed that he was investigating "personal abuse" and inappropriate use of the computer database.  Id. at 9-10.  When asked about whether he investigated the library used by the Public Defender's Office, he stated:

> The allegations were that lawyers within the Public Defender's Office were using [the computer database] for their own personal use or legal staff so doing the same, perhaps the District Attorney.  The rumors were quite pervasive.  They were not of my immediate concern.  Me, not having supervision over those functions.

> The allegations that I was interested in was that the police sergeant who created the system some four or five years ago was using the system inappropriately.

Id. (brackets added).  Lt. Suttmeier denied accessing any files from the Public Defender's Office stating, "I told you I didn't look for any improprieties in the Public Defender's system.  I did absolutely nothing with none -- any of [their] data.  I didn't even read the titles."  Id. at 14-15 (brackets added); see also id. at 118 ("I have never ever looked into [the Public Defender's Office's] files not anyone other than police department files.").

Joseph Campanella, the Wang computer system administrator, testified that Lt. Suttmeier would have been unable, at the level of training and experience he had then, to operate the word processing system used to access any of the files in the computer database.  Id. at 214.

47

United States District Court
For the Northern District of California

The trial court denied the motion to dismiss upon finding Lt. Suttmeier's lack of expertise prevented him from having access to the files on the computer database of the Public Defender's Office:

> I believe Lieutenant Suttmeier when he testified and I so find beyond a reasonable doubt -- that he himself could not operate the computer with sufficient expertise, not to do it without calling for his assistants who, by any account, clearly did have that technical ability.

Id. at 266.

In his federal petition, Petitioner alleges that Lt. Suttmeier's unrestricted access to files from the Public Defender's office violated his attorney-client relationship. He argues that the trial court's determination of the facts was erroneous by stating that "prosecutorial misconduct in the instant case clearly shows that the prosecution illegally accessed, and utilized, confidential information protected by attorney-client privilege." (Traverse at 6.)

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Section 2254(d)(2) applies to intrinsic review of a state court's process. Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004). An unreasonable determination of the facts occurs where the state court fails to

48

consider and weigh highly probative, relevant evidence, central to the petitioner's claim, that was properly presented and made part of the state court record. Id. at 1005. The relevant question under § 2254(d)(2) is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the state court findings are supported by the record. Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir. 2004).

Here, the trial court addressed in detail Petitioner's claim of a violation of his attorney-client privilege. After conducting a hearing on the motion to dismiss with testimony by several witnesses, it found no bad motive in Lt. Suttmeier's actions and that he did not have sufficient expertise to access any files on his own. Resp't Ex. 11 at 266. This Court has reviewed the record upon which the trial court relied and finds that the court's conclusion was not based on an unreasonable determination of the facts in light of the evidence presented in the motion to dismiss and at the in camera hearing. Furthermore, even if Petitioner were able to show that the attorney-client relationship had been intruded upon, he made no showing of substantial prejudice to his defense as a result of any such intrusion. See Danielson, 325 F.3d at 1069.

Because the state court's rejection of Petitioner's claim was not objectively unreasonable, see Himes, 336 F.3d at 853, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, 28 U.S.C.

United States District Court
For the Northern District of California

1  § 2254(d)(2), this claim for habeas corpus relief is denied.

2              2)    Access to Petitioner's Records

3

4         Petitioner claims that because of Lt. Suttmeier's access to

5   the computer database of the Public Defender's Office, the

6   prosecution improperly obtained Petitioner's psychiatric records

7   and Children's Service Agency records.  The records that related

8   to his mental health were obtained from the Edgemeade School[11] in

9   Texas, and the other records came from the Children's Service

10  Agency in New Jersey.

11

12        Defense counsel filed a motion to suppress the records, any

13  reports or memos made by the prosecution relating to the memos,

14  and a taped interview with Mr. Slater, an employee of the

15  Edgemeade School.[12]  At the hearing on the motion to suppress, the

16  prosecution's investigator testified that he became aware of the

17  possible existence of the records after Petitioner's mother was

18  deposed -- prior to the time Lt. Suttmeier had access to the

19  computer database of the Public Defender's Office.  Resp't Ex. 12

20  at 23-24.  The trial court suppressed the New Jersey records and

21

22

23       [11] The Edgemeade School is a residential treatment center for
24  emotionally "disturbed" teenagers.  Resp't Ex. 12 at 8.

25       [12] The issue before the Court is not the legality of the search
    for, or seizure of, Petitioner's records.  These issues were fully
26  litigated by Petitioner in state court and "where the State has
    provided an opportunity for full and fair litigation of a Fourth
27  Amendment claim, a state prisoner may not be granted federal habeas
    corpus relief on the ground that evidence obtained in an
28  unconstitutional search or seizure was introduced at his trial."
    Stone v. Powell, 428 U.S. 465, 494-95 (1976).  Here, Petitioner is
    arguing that the prosecutor committed misconduct by accessing the
    database and improperly obtaining Petitioner's records.

                                   50

ordered them returned in their sealed condition.  <u>Id.</u> at 146-154.
The court also suppressed the Texas records upon finding that they
were privileged and that the privilege was violated by the manner
in which they were obtained.[13]  (<u>Id.</u> at 145-146, 153-155.)  The
court also ordered that the taped interview with Mr. Slater be
suppressed as well as all copies or summaries of copies of the
records that the prosecution may have prepared from the records.
(<u>Id.</u> at 153).  Finally, the court ordered the prosecutor to
establish at trial that no questions asked of witnesses were
derived from knowledge of the suppressed records.  (<u>Id.</u> at 155.)

Petitioner argues that Lt. Suttmeier's access to the computer
database of the Public Defender's Office led the prosecutor to
obtain his psychiatric records and Children's Service Agency
records.  Even if such records were improperly obtained, the trial
court suppressed these records and thus there is no showing that
any evidence produced at trial was based on or derived from the
improperly obtained records.  Moreover, there is no showing of
prejudice to Petitioner because, as defense counsel conceded
during the <u>in camera</u> hearing, the documents at issue and "most of
the documents" contained in the computer database of the Public
Defender's Office were relevant to the penalty phase strategy

---

[13] Specifically, the trial court found that the prosecutor used a
"municipal Court subpoena signed by the District Attorney himself and
not by any court" to produce the Texas records.  Resp't Ex. 12 at 145-
146.

United States District Court
For the Northern District of California

rather than to trial strategy.[14]   Pet'r Ex. E1 at 76.

For these reasons, the Court finds that the state court's rejection of Petitioner's claim involving improper access to his records was not objectively unreasonable.  See Himes, 336 F.3d at 853.  Accordingly, this claim for relief is denied.

> 3)    Seizure of Letters Between Petitioner and Velma

Petitioner alleges the prosecutor committed misconduct by violating his attorney-client privilege when the San Francisco Sheriff's Department (SFSD) monitored and photocopied letters between Petitioner and Velma, his wife and co-defendant, while they were in jail awaiting trial.  He claims that photocopies of these letters were passed on to the investigators for the prosecution and eventually to the prosecutor.

Petitioner alleges a violation of attorney-client privilege because information pertaining to his defense strategy was communicated in those letters.  Petitioner filed a motion to

---

[14]   At the _in camera_ hearing, Petitioner's defense counsel suggested another option for the Court to consider if it chose not to dismiss the entire case:

> I want to suggest to the Court, at this _in camera_ session, that one remedy which is appropriate in Mr. Henderson's case would be if the Court is not going to dismiss this case in its entirety is to dismiss the special circumstance allegation because I would like to represent to the Court that most of the documents, but not all of them, a lot of the documents in there relate to the penalty phase strategy.

Pet'r Ex. E1 at 76.

United States District Court
For the Northern District of California

suppress the letters.[15]

During the hearing on the motion, SFSD Sergeant Keith A. Thompson testified that they started intercepting Petitioner's mail because some of the letters exchanged between Petitioner and Velma were written in code and contained diagrams of the jail or a jail cell, which raised concerns about jail and courthouse security. Resp't Ex. 13. at 93, 97. Sergeant Thompson stated that the jail did not have the facilities for deciphering the code; therefore, he contacted Ron Huberman, an investigator for the prosecution. Id. at 112. Sergeant Thompson testified that Mr. Huberman asked for copies of Petitioner's letters to be sent to him. Id. at 113. Sergeant Thompson estimated that he reviewed three months of correspondence, which totaled about ninety letters. Id. at 111. He testified that he forwarded copies of all these letters to Mr. Huberman. Id. at 114. About a month or two after they started intercepting Petitioner's mail, Sergeant Thompson testified, he was informed that the "codes had been broken down" by Mr. Huberman and that "there was nothing in the coded sections that had anything to do with any county jail plans for escape." Id. at 115-16. He ordered that the letters no

_____

[15] The Court notes that neither Petitioner nor Respondent has provided the Court with the outcome of Petitioner's motion to suppress the letters. Respondent's Exhibit 13 contains only excerpts of the hearing on the motion. Resp't Ex. 13 at 93-119, 453-466, 484-488. However, the issue before the Court is not the legality of the search for, or seizure of, Petitioner's letters because a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. See Stone, 428 U.S. at 494-95.

longer be intercepted, and he stopped making copies for Mr. Huberman.  Id. at 116.

Although the attorney-client privilege does not protect communications between a defendant and his wife, Petitioner claims that the letters contained information about their defense strategies.  (Pet. at 145.)  A prosecutor's access to defense strategies could amount to a violation of the Sixth Amendment right to counsel.  See Danielson, 325 F.3d at 1067 (holding that defendant made a prima facie showing that his Sixth Amendment right to counsel was threatened when the prosecution intentionally obtained access to defense strategies).  Here, however, Petitioner has failed to make a prima facie showing that the prosecutor gained access to his defense strategies.

Petitioner has not provided the Court with specific information on what defense strategies were actually in the letters.  See Hendricks v. Vasquez, 908 F.2d 490, 491-92 (9th Cir. 1990) (a petitioner must state his claims with sufficient specificity).  Therefore, his conclusory allegations that the prosecutor gained access to his defense strategies based on the investigator's access to his letters are insufficient to warrant habeas relief.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) (conclusory allegations not supported by a statement of specific facts do not warrant habeas relief).

Because Petitioner's conclusory allegations fail to establish that there was any misconduct on the part of the prosecutor, the

54

Court finds that the state court's denial of his prosecutorial misconduct claim was not objectively unreasonable.  <u>See</u> <u>Himes</u>, 336 F.3d at 853.  Therefore, Petitioner's claim for relief on this issue is denied.

> 4)   Monitoring Attorney-Client Conversations

Petitioner alleges that his attorney-client privilege was violated because the jail pay phones and the attorney-client interview rooms were monitored.

In a sworn affidavit attached to his petition, Petitioner states his belief that the jail pay phones were monitored.[16]  Pet'r Ex. E2 at 1-4.  He states that he was told that a fellow inmate made threatening comments while on one of the jail pay phones and "within minutes of the conversation" SFSD officers arrived and demanded that the inmate who made the threatening comments surrender himself.  <u>Id.</u> at 2.  He claims that he asked one of the officers about the incident and that he was informed that the calls on jail pay phones were recorded.  <u>Id.</u> at 2-3.

The Court will assume, for the purposes of Petitioner's claim, that the jail pay phones and the attorney-client interview rooms were monitored.  Petitioner's claim still fails.  He has provided the Court with no specific allegations as to how he was prejudiced by such an intrusion.  His claim is no more than a

---

[16] Petitioner's sworn statement does not contain any information about his belief that the jail's attorney-client interview rooms were also monitored.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

conclusory assertion lacking any factual detail or reference to the record.  <u>See</u> <u>Hendricks</u>, 908 F.2d at 491-92.  He has alleged no facts which demonstrate that his preparation for trial was prejudiced by virtue of the monitored conversations, a necessary element to prevail on a claim of prosecutorial misconduct.  <u>See</u> <u>Smith</u>, 455 U.S. at 219 ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

Without the requisite showing of prejudice, Petitioner has failed to substantiate his allegation of prosecutorial misconduct based on a violation of his attorney-client relationship. Accordingly, the Court denies habeas relief as to this claim because the state court's denial of this claim was objectively reasonable.  <u>See</u> <u>Himes</u>, 336 F.3d at 853.

D.   CONCLUSION

Petitioner has not shown that the prosecutor committed misconduct which rendered his trial fundamentally unfair.  The denial of his prosecutorial misconduct claims by the state court was not objectively unreasonable.  <u>See</u> <u>Himes</u>, 336 F.3d at 853. Accordingly, his claims for habeas relief based on prosecutorial misconduct are denied.

II.  ACTUAL INNOCENCE

A.   BACKGROUND

56

**United States District Court**
For the Northern District of California

In an Order dated March 6, 2006, the Court allowed Petitioner to proceed with his claim of actual innocence only to the extent that it was based on the allegations related to his prosecutorial misconduct claims.  (Mar. 6, 2006 Order at 15.)  In his traverse, Petitioner states that "an objective consideration of the uncontroverted evidence, once purged of the fabrication and perjury complained-of herein, clearly shows that Petitioner is actually innocent of the charges against him, and is entitled to issuance of the writ of habeas corpus."  (Traverse at 6.)

B.   APPLICABLE FEDERAL LAW

Although actual innocence may be grounds to excuse a procedural default, <u>see</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 316 (1995), in the absence of constitutional error it is not in itself sufficient for federal habeas relief, <u>Herrera v. Collins</u>, 506 U.S. 390, 404 (1993).

The Ninth Circuit Court of Appeals has made clear that after <u>Herrera</u> there can be no habeas relief based solely on a petitioner's claim of actual innocence of the crime.  See <u>Coley v. Gonzales</u>, 55 F.3d 1385, 1387 (9th Cir. 1995) (although actual innocence is not itself a claim, it can be a gateway through which a habeas petitioner may pass to have his otherwise procedurally barred constitutional claim considered on the merits); <u>Swan v. Peterson</u>, 6 F.3d 1373, 1384 (9th Cir. 1993).

C.   ANALYSIS

57

United States District Court
For the Northern District of California

In its prior Order, the Court allowed Petitioner to proceed with all of his asserted claims that were not time-barred. However, while Petitioner's assertion that he is actually innocent of the charges against him is not time-barred, it also does not present a constitutionally cognizable claim for relief.

In deciding <u>Herrera</u>, the Supreme Court "assume[d], for the sake of argument . . . , that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417. This is a "freestanding" actual innocence claim, in which the petitioner argues that the evidence sufficiently establishes his innocence, irrespective of any constitutional error at trial or sentencing. <u>See</u> <u>Carriger v. Stewart</u>, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). The petitioner's burden in such a case is "'extraordinarily high,'" and requires a showing that is "'truly persuasive.'" <u>See</u> <u>id.</u> (quoting <u>Herrera</u>, 506 U.S. at 417). However, Petitioner's case is not a capital case; therefore, it does not come within the limited exception mentioned in <u>Herrera</u>. 506 U.S. at 417.

Petitioner has not shown that the state court's denial of his actual innocence claim was objectively unreasonable. <u>See</u> <u>Himes</u>, 336 F.3d at 853. Without a Supreme Court case establishing a constitutional right, Petitioner cannot show that the state court

United States District Court
For the Northern District of California

denied him that right.  Accordingly, Petitioner is not entitled to the writ on this claim.[17]

III. CUMULATIVE ERROR

    A.   BACKGROUND

    Petitioner claims that the cumulative effect of all of the foregoing asserted errors caused his trial to be fundamentally unfair in violation of his right to due process.  This claim was not raised on direct appeal, and the state supreme court summarily denied the claim on habeas corpus review.

    B.   APPLICABLE FEDERAL LAW

    Petitioner cites no Supreme Court precedent providing that the cumulative effect of numerous alleged errors, no one of which is of constitutional dimension, may violate a defendant's due process right to a fair trial.  The Supreme Court has, however, long recognized that "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing

---

[17] In his traverse, Petitioner requests an evidentiary hearing and appointment of counsel.  However, an evidentiary hearing is not necessary because Petitioner fails "to show what more an evidentiary hearing might reveal of material import on his assertion of actual innocence." Gandarela v. Johnson, 286 F.3d 1080, 1087 (9th Cir. 2002) (the district court did not abuse its discretion in determining that an evidentiary hearing on actual innocence was unnecessary). Furthermore, the Court has found that Petitioner's allegation that he is actually innocent provides no independent basis for federal habeas relief.     Thus, an evidentiary hearing is not warranted, and his request is DENIED.   In part because the Court has found that an evidentiary hearing is not necessary, his request for appointment of counsel is DENIED.

as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." United States v. Hasting, 461 U.S. 499, 508-509 (1983). It is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations. Id. As explained above, AEDPA mandates that habeas relief may only be granted if the state courts have acted contrary to or have unreasonably applied federal law as determined by the United States Supreme Court. See Williams, 529 U.S. at 412 ("Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."). In the absence of Supreme Court precedent recognizing a claim of cumulative error, therefore, habeas relief cannot be granted.

Moreover, to the extent that such a claim has been recognized by the Ninth Circuit, where there is no single constitutional error there can be no cumulative error that rises to the level of a due process violation. See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

C.   ANALYSIS

Petitioner cannot establish that the state court's rejection of his cumulative error claim was contrary to or an unreasonable application of clearly established federal law because the Supreme Court has never recognized a cumulative error claim. Further, even if such a claim did have a basis in Supreme Court precedent,

60

it would fail here because there were no constitutional errors and thus no errors which could accumulate into a due process violation.  Accordingly, this claim for habeas relief is denied.

//

//

//

//

//

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied.  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: 3/13/07

_____
CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California

61

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


HENDERSON,

        Plaintiff,                             Case Number: CV98-04837 CW

   v.

NEWLAND,                                 **CERTIFICATE OF SERVICE**

        Defendant.

_____/


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.


That on March 13, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Dane R. Gillette

CA State Attorney General's Office

455 Golden Gate Avenue, Suite 11000

San Francisco,  CA 94102-7004


Philip W. Henderson D36152

MCSP

P.O. Box 409000

Ione,  CA 95640-9000


Dated:  3/13/07

                                      Richard W. Wieking, Clerk

                                      By: Sheilah Cahill, Deputy Clerk